Paglia matched the one projectile from the Rye House basement. Tr. July 14: 86, 90-91, 128-129; and July 15: 19-26, 32-34, 41-50.

(4) The Alibi Evidence

Petitioner Daye presented eyewitnesses, documents, and expert testimony supporting his alibi that he attended a wake at the time of the Paglia murders. This evidence, according to this Court's decision, "had it been believed by the juries, would have contradicted Moodie's testimony and thus would have benefited the defense of Costa and DiNictolis , as well as Daye." Daye , 411 Mass. at 725.

In addition to eyewitness testimony, including Church clergy and the funeral home owner, Special Agent John Paulscik, certified examiner of questionable documents assigned to the FBI laboratory, examined the Wake Register and determine that Daye "probably prepared" his signature therein at the time of the wake." Tr. July 17, 147-177, 183-197). Special Agent Paulscik explained that "probably prepared" is just one level below a positive identification: "I'm stating that I'm, not positively sure, but that the level of qualifying opinion is to the extreme or to the height, that I'm very close in reaching the opinion that it was written by the particular individual. (Tr. July 16-July 21, July 17: 147-177, 183 & 189-197 Special Agent Paulscik).

The jury, however, credited Moodie's testimony over Daye's alibi witnesses. The jury did not hear however, how Moodie now claims that she did not even know the date that Daye was released from jail and was alleged to have arrived at the Rye, New Hampshire house. Nor did the jury hear that Lt. Spartichino coached Moodie prior to her testimony. The jury never heard how Lt. Spartichino corrected Moodie's original version of events where she recalled conversations between Costa and Daye at the Rye house when in fact

21

Daye had actually been in jail. According to Moodie, Lt. Spartichio provided Moodie

with correct dates for these conversations based on Daye's release from prison and, then

edited Moodie's notes including the corrected dates. In addition, according to Moodie,

Lt. Spartichino coached Moodie with hand signals and gestures during her testimony to

assist her in securing convictions against Daye. The trial court claimed Lt. Spartichino's

actions, if Moodie is to be believed amounted to nothing more than "ordinary witness

coaching." (Exhibit 73). Daye seeks this Court's evaluation of Moodie's recent affidavit

and video taped statement under oath for a determination of whether the trial court's

finding Lt. Spartichino's actions was "ordinary witness coaching" is clearly erroneous.

ARGUMENT

THE STATE COURT RULING DENYING THE PETITIONERS THIRD
MOTION FOR A NEW TRIAL CLAIMING THE PROSECUTOR DID NOT VIOLATE
ITS BRADY OBLIGATIONS BY SUPPRESSING EVIDENCE THAT THE STATE'S
MAIN WITNESS RECEIVED A $ 10,000.00 REWARD FOR HER TESTIMONY-
EVIDENCE WHICH EMERGED SOME 14 YEARS AFTER THE CONVICTIONS-
COMBINED WITH THE WITHHOLING OF 7000 PAGES OF DISCOVERY,
ORGIONAL FINGERPRINT CARDS AND OTHER REPORTS INVOLVED AN
UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE
EVIDENCE PRESENTED AT THE POST CONVCITION PROCEEDINGS AND
FURTHER CONSITITUED AN UNREASONABLE APPLICATION OF CLEARLY
ESTABLISHED FEDERAL LAW

A. Standard of Review Under AEDPA.

Under 28 U.S.C. sec. 2254 (d)(1), a federal district court may grant a habeas

corpus petition only where the state court had adjudicated the claim in a manner

that was "contrary to or involved an unreasonable application of clearly

established Federal law as decided by the Supreme Court of the United States."

This Court must thus make a two-step determination 1) whether a constitutional

violation has occurred; and 2) whether the state court's ruling was contrary to or

involves an unreasonable application of clearly established federal law was objectively unreasonable. See Hurtodo v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001) ("[t]he habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted").

To satisfy the "contrary to" prong, the state court must be shown either to have "arrived at conclusion opposite to that reached by [the Supreme] Court on a question of law" or to have decided a case differently than the Supreme Court on a set of "materially indistinguishable" facts. Williams v. Taylor, 529 U.s. 362, 406 (2000) (Opinion of the Court, Part II, per Justice O'Connor).

To satisfy the "unreasonable application" prong, the state court's application of federal law must be shown to have been "objectively unreasonable," and not simply and erroneous or incorrect" application of federal law. Id. at 409-412. Under this court's pre- William v. Taylor ruling in O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998), a state court ruling will be deemed an "unreasonable application " only where the decision is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." Id. at 25. Although other circuits have adopted less demanding formulations, see Matteo v. Superintendent, 171 F.3d 877 (3d Cir. 1999), cert denied, 528 U.S. 824 (1999) (rejecting this Circuit's outside –the- universe- of –plausible-outcomes test on the ground that it excluded all but those decisions "so far off the mark as to suggest judicial incompetence."); see also Francis S. v. Stone, 221 F.3d 100, 111 (2nd Cir. 2000);

Long v. Humphrey, 184 F.3d 758 (8th Cir. 1999); Tuan Van Tran v. Lindsey, 212

F. 3d 1143, 1152-1154 (9th Cir. 2000), this Court has ruled that the O'Brien

formulation is fully consistent with and survives Williams v. Taylor. See

Williams v. Mateasanz, 230 F.3d 421, 424-425, 427 (1st Cir. 2000). It is the

petitioners' position that the First Circuit's beyond-the-universe formulation is

more demanding than that required by the statute.

In evaluating the state courts decision as to the federal constitutional issues, the

state court's factual findings "shall be presumed to be correct," absent proof by

the petitioner disproving such findings by "clear and convincing evidence." 28

U.S. C. sec. 2254.  Where a state court has failed to address a federal issues,

AEDPA's deferential standard of review is inapplicable, and the habeas court

must then conduct a  de novo review as to these unreviewed federal constitutional

claims.  DeBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001); Fortini v. Murphy,

257 F.3d 39, 47 (1st Cir. 2001) (noting that state court may decide federal

constitutional claims "even by reference to state court decisions dealing with

federal constitutional issues").

B. The Commonwealth's Suppressed Evidence that Karen Moodie received  a $
   10,000.00 reward from the District Attorney's Office after testifying for the
   Commonwealth, suppressed reports, fingerprint cards of other suspects and
   suppressed Boston Police Ballistics evidence linking another suspect to the
   murders.

   1.  *The Withheld  $ 10,000.00 Payment to Moodie*

In her affidavit, Moodie claims that the Commonwealth promised her, and in fact

paid her, $10,000.00 in exchange for her testimony, which led to the convictions of Daye.

Specifically, she recalled that the $ 10,000.00 check was drawn on a Commonwealth

account and signed by Assistant District Attorney Fred MacAlary.  The Commonwealth

24

mailed her check to her brother's address in Iowa. Moodie cashed the check in Nebraska. (Exh. 51,53, 58).

The Commonwealth claimed it had no way to verify Moodie's claim because 14 years had passed between the time they issued the check and her affidavit to petitioners That the Commonwealth had concealed this payment for 14 years should not shield them from explaining their failure to disclose the payment to the petitioners. That the Commonwealth has attempted to hide behind its own non-disclosure to deflect blame on the petitioners for their late notice of their claim, is exactly why this Court should grant the petitioners an evidentiary hearing. Absent any affidavit, the Commonwealth claimed and the trial court held that the "collective memory" of some unnamed individuals at the district attorney's office was that the payment to Moodie was not a reward, and only amounted to $5,000.00. (Exhibit 70). The current record is devoid of any support for this claim. As such, the trial court's finding that the payment to Moodie was only for $5,000.00 and was for relocation expenses is clearly erroneous. See, U.S. v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002); Gigilov v. U.S., 405 U.S. 150, 154 (1972).

Assuming arguendo, but not conceding, that the proper standard for evaluation of the $10,000 payment to Moodie was the "newly discovered evidence" standard, the trial court's conclusion that this new evidence did not warrant, at a minimum, an evidentiary hearing is clearly erroneous.

Here, the new evidence is both material and credible. It destroys the Commonwealth's theory of Daye, Costa and DiNictolis' guilt through their alleged association with Moodie. In addition, it fully supports Daye's claim at trial that persons other than Daye killed the Paglias.

2. *The Withheld 7000 Pages of Discovery*

From the inception of this prosecution the petitioners have pursued the defense of "other suspects" and inadequate police investigation. Daye at 724-725. The petitioners' entire defense at trial was that other suspects committed this crime. The petitioners' defense of "other suspects" was strictly limited at trial on the basis that Daye had not adequately demonstrated that the evidence would tend to show that (1) persons other than them murdered the Paglias, or (2) that the police bungled the investigation or otherwise avoided the pursuit of the truth. Daye, 411 Mass. at 721-722; 727-728. See also, Commonwealth v. Graziano, 368 Mass. 325 (1975) (other suspects defenses); and Commonwealth v. Bowdin, 379 mass. 472 (1980) (inadequate police investigation defense);. See, also, Tr. June 25 132-138, July 8: 139-143, July 9: 76. Seven thousand additional documents have now surfaced which could shed light on the actions of the police during the first seventeen months of the investigation. Trial counsel for Costa submitted an affidavit that he never received 7000 pages of information relative to the first seventeen months of the investigation. (Affidavit of Earle C. Cooley) The Commonwealth submitted no affidavits, but claimed in their opposition to the petitioners Motion for a New Trial, that the documents, which their office originally claimed related to the first seventeen months of the investigation, were in fact, pleadings of the petitioners. (Commonwealth's Opposition, Exhibit).

The Commonwealth's claim that the petitioners already possessed the documents in dispute is contradicted by specific letters of Essex County Assistant District Attorney Daniel I. Smulow. (Exhibit 39). Assistant District Attorney Smulow confirmed for the petitioners that the documents were not pleadings, trial transcripts or other documents

26

available in the public file, but were directly related to the first seventeen months of

investigation of the Paglia homicides, before the petitioners became suspects. (Exhibit

39). The trial court failed to address this conflict. Instead, the trial court claimed that the

petitioners are free to pay the $10,000.00 and review the documents. (Exhibit 73). The

petitioners are indigent and have no way to pay the Commonwealth for this discovery.

Moreover, the trial court's fails to address the main thrust of their claim; that the trial

court ordered the Commonwealth to disclose information regarding other suspects, and

they failed to disclose 7000 pages of documents. Because the state court failed to address

the petitioners Brady claim, this Court if free to review it de novo.

> 3.  *The withheld Fingerprint cards and ballistics evidence.*

The state court dismissed the petitioners claims relative to the withheld fingerprint

and ballistics evidence absent any support in the record, that the Commonwealth

did not have possession of this evidence prior to their trial. The state courts

finding is so devoid of record support and so arbitrary that it is "outside the

universe of plausible credible outcomes." O'Brien v. DuBois, 145 F3d 16 (1st Cir.

1998).

> C.  Because the new evidence supports the petitioners' theory at trial, that others
> committed this crime, the evidence was both material and credible.

The Commonwealth's theory at trial was that Costa, Daye and DeNictolis shot

and killed Robert and Patricia Paglia during an attempted drug rip-off. The sole issue at

trial was the identification of the perpetrators. In effect, the principle issue before the

jury was one of credibility of the witnesses. The Commonwealth relied upon the

testimony of Karen Moodie to present its theory that Daye planned the drug rip-off of

Robert Paglia while they stayed with Moodie in a house in Rye, New Hampshire.

Moodie told the jury that she was present with Costa and Daye when they discussed their plans to rob the Paglias. According to Moodie; Costa, Daye and DiNictolis planned to gain entry into the Paglia home by posing as a Boston police detective and officer, respectively. According to Moodie, DiNictolis attended the Paglia's baby's christening to case the Paglia house and provide details to Costa and Daye. In addition, Moodie alleged that DiNictolis was the get away driver on the day of the murders.

Trial counsel impeached Moodie on various aspects of her inconsistent statements to the police. If petitioners could have presented evidence of Moodie confusion over the timing of the conversations she claimed to have overheard between Costa and Daye, while Daye was in jail, it is highly likely that the jury would have credited Daye's alibi witness. Moreover, the new evidence of Moodie's association with Limoli, Barone and Salemme, combined with the evidence in the Essex County District Attorney's file of Barone's attempted arrest with a weapon capable of firing the same .38 caliber ammunition that killed Patricia Paglia would have provided Daye with considerable opportunity to develop their theory that others committed this murder.

Moodie provided an affidavit, verified and videotaped detailing deliberate steps taken by law enforcement to conceal the existence of other suspects and bolster Moodie's testimony. In her affidavit, Moodie details her association with Limoli, Salemme and Barone. She placed Limoli, Salemme and Barone in the Rye, New Hampshire house at various gambling actives. (Exhibit 51). According to Moodie, Lt. Spartichino, specifically directed her not to mention her association with or knowledge of Limoli, Barone or Salemme because they were original suspects in the Paglia homicide.

Both the Commonwealth and the trial court interpreted Lt. Spartichinio's actions as "benign, ordinary witness preparation" (Exhibit 70, p. 24). As such the trial court found that the petitioners' had failed to present any evidence of bad faith on the part of the prosecutor. The real issue is not the good or bad faith of the prosecutor, rather, the state court should have evaluated the petitioner's claim to determine if the suppressed testimony, or evidence disclosed by it is exculpatory and material. Cf. Boyette v. LaFerre, 246 F.3d 76 (2nd Cir. 2001) Habe petition granted (prosecution in single-witness identification case withheld police reports showing that complainant who claimed certainty about identity initially experienced uncertainty.) Moreover, the state court examined the significance of the link between the Paglia and Limoli and Salemme only in the context of Moodie's affidavit. The trial court failed to consider the significance of Moodie's affidavit as it relates to and was corroborated by the DiNunzio information. The trial court's finding that this Court already determined that the petitioners would not have been able to use this information to influence the jury in any significant way, is erroneous in light of the new evidence. The trial court's deference to the Supreme Judicial Court's decision on direct appeal, which was factually undermined by the petitioner's new evidence is precisely why this matter should be addressed by this Court. Cf. Guerra v. Johnson, 90 F.3d 1075 (5th Cir. 1996) (habe allowed where police coerced two eye-witnesses into corroborating prosecution's theory that petitioner fired shot.), and Kordenbvock v. Scroggis, 919 F.2d 1097 (6th Cir. 1990) (en banc), cert. denied 499 U.S. 970 (1991) (habe allowed where police suppressed tape-recorded version of confession and pieced together written statements that gave description of crime different from description in actual confession.)

Holding the petitioners' responsible for the Commonwealth's suppression of evidence is an outrageous misapplication of <u>Brady's</u> principles. <u>Scott v. Mullin</u>, 303 F.3d 1222, 1229 (2002)(It is not a [defendant's] responsibility to uncover suppressed evidence). Moreover, it is undisputed that the Commonwealth paid Moodie some amount after trial, and that the Commonwealth failed to disclose this payment to the petitioners. It is also undisputed that the petitioners had the right to present this evidence impeaching Moodie's credibility. <u>United States v. Bagley</u>, 473 U.S. at 676. This withheld reward, when combined with the withheld fingerprint evidence, the withheld ballistics and the withheld 7000 pages of discovery from the first seventeen months of the investigation, destroys the Commonwealth's theory of the petitioners guilt, and further supports the petitioners theory that other suspects committed this crime.

Here, because the petitioners have never received an evidentiary hearing on any of these claims, the state court's factual findings should not be entitled to "special deference." Moreover, the state court's conclusions that the prosecution did not improperly fail to make any required disclosures is utterly unsupported by the record, is at odds with the constitutional and common law standards governing the Commonwealth's discovery obligation, and should thus be set aside. See <u>Commonwealth v. Tucceri</u>, 412 Mass. 401, 408-414 (1992) (applying principles of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), in the context of state new trial motions). As such, the state courts ruling involves both an "unreasonable determination of fact" as well as a failure to address a federal constitutional issues that requires this Court's de novo review.

<u>D. The Commonwealth's Duty to Disclose Exculpatory Evidence, Including impeachment evidence in police possession, is clearly established federal law.</u>

"Due process of law requires that the government disclose to a criminal defendant favorable evidence in its possession and that could materially aid the defense against the pending charges. Brady v. Maryland, 373 U.s. 83, 87 (1963); United States v. Bagley, 473 U.s. 667, 687 (1985); Kyles v. Whitley, 514 U.s. 419 (1995). This duty extends to evidence in the possession of the police who participated in the investigation and presentation of the case and to individuals under their control. Kyles, 514 U.S. at 437. (prosecutor must disclose "any favorable evidence known to others acting on the government's behalf in the case, including the police""); Strickler v. Green, 527 U.S. 263, 275 (1999). See also, Tucceri, 412 Mass. at 407; Commonwealth v. St. Germain, 381 Mass 256 (1980).    The prosecution's obligation to disclose exculpatory evidence or evidence otherwise favorable to the defense includes material that impeaches the reliability of a critical government witness. Giglio v. United States, 405 U.S. 150, 154 (1972); Commonwealth v. Ellison, 376 Mass. 1 (1978). In this case, the withheld fingerprint card from the other suspects, the withheld Boston Police reports of another suspect in possession of a gun which could have been the murder weapon, and the withheld reports from the first seventeen months of the investigation were all, at some point in the possession of the state. How and when the state came into possession of these documents remains a mystery. Every one of the documents the petitioners discovered in state custody would have cast doubt on Moodie's version of the events and would have corroborated Daye's alibi and thereby Costa and DeNictolis's innocence. This evidence, combined with the undisclosed reward would have formed "powerful impeachment" evidence for the petitioners.    Financial rewards offered or received in exchange for testimony constitute a particularly powerful form of impeachment material

that must be disclosed by the Commonwealth. See Bagley, 473 U.S. 678 (new trial required if undisclosed evidence of $ 300.00 payments to government witness "might have bee helpful in conducting the cross-examination").

A writ must issue where without the undisclosed evidence, the petitioners did not "receive a fair trial, understood as a trial resulting in a verdict worthy of confidence" and the suppression of the evidence "undermined confidence in the outcome of the trial. Kyles, 514 U.S. at 435. Accordingly, the states failure to furnish the petitioners with evidence of the reward, the fingerprint cards, the other suspect reports and the ballistic evidence "denied [the petitioners] a substantial factual basis for contending to the jury" that Moodie's trial testimony was not credible and "would have played an important role in the jury's deliberations and conclusions." See Kyles v Whitley, 514 U.s. 419, 434 (1995).

Under these circumstances. the state court's ruling was thus" so offense to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible credible outcomes." O'Brien v. DuBois, 145 F.3d. 16. At the very least, it was such an objectively "unreasonable determination of the facts in light of the evidence presented in the state court proceedings" 28 U.S.C. sec. 2254 (d)(2), that the writ must necessarily issue.

Respectfully Submitted,
DENNIS M. DAYE
RICHARD M. COSTA
MICHAEL DENICTOLIS,
By Their Attorney,

Rosemary Curran Scapicchio
Four Longfellow Place
Suite 3703
Boston, Massachusetts 02114
(617) 263-7400
BBO # 558312

33